(No. 15619.—Judgment affirmed.)

GEORGE ATWOOD, Defendant in Error, *vs.* THE CHICAGO,
MILWAUKEE AND ST. PAUL RAILWAY COMPANY, Plain-
tiff in Error.

*Opinion filed June 17, 1924.*

1. LEASES—*what provision releasing a lessor from liability for
negligence is valid.* A clause in a lease between a railroad com-
pany and a party who had erected an elevator on the company's
right of way exempting the lessor company from liability for fire
damage caused by sparks emitted from its locomotive engines is a
valid provision.

2. SAME—*possession through tenant is notice of owner's rights.*
Possession of an owner through his tenant is notice to the world
of the owner's rights.

3. SAME—*when party accepting building on leased premises be-
comes liable as assignee.* A party who acquires, by conveyance or
gift from the lessee, the title to a building on leased premises is
charged with knowledge of the lessor's rights, and is bound to ob-
serve, as assignee of the term, such covenants as run with the land,
as the form of the assignment is immaterial, and the transfer ex-
tinguishes the privity of estate between the lessor and lessee, but
the lessor continues liable on his express covenants.

4. SAME—*covenant releasing a railroad company from liability
for fire does not run with land.* Where the owner of land adjoin-
ing a railroad right of way constructs a grain elevator on the right
of way and subsequently obtains a lease of said portion of the
right of way at a nominal rent, a clause in the lease exempting the
railroad company from all liability for fire damage to the elevator
caused by negligent operation of the railroad is a personal covenant
and not a covenant running with the land and which would bind
one subsequently acquiring the elevator by gift from the lessee.

5. NEGLIGENCE—*when court may refuse to direct verdict for de-
fendant railroad company in suit for fire loss.* In a suit against a
railroad company for fire damage caused by sparks from its loco-
motive, the court may refuse to direct a verdict for the defendant
where the evidence as to the direction of the wind, the location of
the fire, its size, and other circumstances, has a fair tendency to
justify the conclusion that the fire was set by a passing engine, not-
withstanding evidence for the defendant tends to show that the
equipment of its engines for fire prevention was of the best and
most approved pattern.

6. APPEALS AND ERRORS—*giving of an instruction cannot be re-viewed if question is not presented to Appellate Court.* The question whether the trial court erred in giving an instruction in an action for negligence cannot be considered in the Supreme Court where the question was not presented to the Appellate Court.

WRIT OF ERROR to the Appellate Court for the Second District;—heard in that court on appeal from the Circuit Court of Winnebago county; the Hon. ROBERT K. WELCH, Judge, presiding.

FISHER, NORTH, LINSCOTT & GIBBONEY, (O. W. DYNES, C. S. JEFFERSON, and M. L. BLUHM, of counsel,) for plaintiff in error.

GARRETT, MAYNARD & HULL, for defendant in error.

Mr. JUSTICE DUNN delivered the opinion of the court:

The Chicago, Milwaukee and St. Paul Railway Company appealed from a judgment of the circuit court of Winnebago county in favor of George Atwood, and upon the affirmance of the judgment petitioned for a writ of *certiorari,* which was allowed.

The action was for the destruction of a grain elevator belonging to the plaintiff by fire caused by the negligence of the defendant. Besides the general issue the defendant filed a special plea relying upon a written lease dated December 27, 1906, whereby the defendant demised to J. B. Atwood, his heirs, assigns and legal representatives, for elevator purposes, a portion of its right of way upon which the elevator stood, for a term of one year from August 1, 1906, and thereafter until sixty days after either party should give to the other written notice of its or his desire to terminate the lease. The third clause of the lease was as follows: "The party of the second part hereby releases the party of the first part from all liability by reason of any injury to or destruction of any property owned by the

party of the second part or in which he is interested, now or hereafter placed upon any part of said premises to him demised and hereinabove described, when such injury or destruction is the result of fire caused by the negligent condition or operation of the railroad of said party of the first part or its engines or cars, or by reason of any other cause whatsoever." The plea alleged that the building and its contents were on the right of way only by virtue of the lease; that the lease had not been terminated, and that by it the defendant was released from the damages which the plaintiff sought to recover. A demurrer to this plea was overruled, and the plaintiff then filed an additional count alleging that the elevator was owned by the plaintiff, was situated upon the land of the defendant, was used for elevator purposes, and that the plaintiff was permitted and invited by the defendant to so use said land without charge so that it could haul grain for the plaintiff from the elevator and thereby derive a profit. The pleas to the original counts were ordered to stand as pleas to the additional count.

The plaintiff in error contends that clause 3 of the lease between it and J. B. Atwood was binding on the defendant in error and relieves it from liability; that there was no evidence of negligence, and that erroneous instructions were given.

J. B. Atwood was the plaintiff's father. He constructed the elevator in 1893 on the east side of the right of way of the railroad company, which runs north and south, about 70 feet south of the highway which crosses the railroad at Roscoe siding. It was a frame building 28x40 feet, and its west wall was 21 feet east of the center of the main track. Atwood operated it without any written contract with the plaintiff in error until the lease was executed, December 27, 1906. The consideration of the lease was one dollar paid by each party to the other "and in further consideration of their mutual and dependent agreements herein contained," by which the plaintiff in error demised the land

on which the elevator stood to Atwood "for the purpose of
maintaining thereon a part of the elevator of the party of
the second part now thereon erected and using said demised
premises for all the usual purposes of an ·elevator," and
Atwood demised to the plaintiff in error a tract of land
east of and contiguous to the right of way "for the pur-
pose of maintaining thereon a portion of its stock yards."
Atwood owned the land which adjoined the east side of
the right of way, and by warranty deed dated November 2,
1909, conveyed it, including the tract demised to the plain-
tiff in error, to the defendant in error, and at the time the
deed was given told the defendant in error that he could
have the elevator, provided his brother should have the
right to use it for storage of his grain. From that time
the defendant in error was in possession of the elevator.
The plaintiff in error received no notice of the change of
ownership. The defendant in error knew the elevator was
on the railroad right of way, but did not inquire and was
not informed by what right it was maintained there.

Clause 3 of the lease was a valid provision. (*Checkley*
v. *Illinois Central Railroad Co.* 257 Ill. 491; *Barlee Tie
Co.* ·v. *Jackson,* 281 id. 452.) The lease had not been ter-
minated when the fire occurred, and "all authorities are
agreed that the general rule is that possession of real es-
tate which is actual, open and visible occupation inconsistent
with the title of the apparent owner by the record, and not
equivocal, occasional or for a temporary or special purpose,
is constructive notice to all the world of the rights of the
party in possession." (*Wood* v. *Price,* 79 N. J. Eq. 620.)
Possession of the owner through his tenant is notice to the
world of the owner's rights. (*Crawford* v. *Chicago, Bur-
lington and Quincy Railroad Co.* 112 Ill. 314; *Thomas* v.
*Burnett,* 128 id. 37; *Mallett* v. *Kaehler,* 141 id. 70.) There-
fore the defendant in error, when he acquired his title, was
bound by knowledge of the rights of the plaintiff in error
as lessor of the land on which the elevator stood and as

lessee of the land used as stock yards. The defendant in error took his title to the lands conveyed to him, and to the elevator, and the right to occupy a portion of the right of way, subject to the terms of the lease. Atwood by the deed and gift divested himself of the entire interest in the term, and thus ceased to be in privity of estate with the plaintiff in error, and the defendant in error became in privity of estate with the plaintiff in error and hence liable as assignee of the term. (*Sexton* v. *Chicago Storage Co.* 129 Ill. 318.) The form of the assignment is immaterial, but after the transfer there was no longer a privity of estate between the lessor and Atwood. (*Taylor* v. *Marshall,* 255 Ill. 545.) Nevertheless he continued liable upon his express covenants, and George Atwood, his assignee, became liable upon such covenants as run with the land, by reason of his privity of estate. (*Sexton* v. *Chicago Storage Co. supra.*) "Where there are express covenants in a lease which run with the land, such as to pay rent, the lessee is bound to their performance by reason of his being both in privity of contract and privity of estate with the lessor, and the privity of contract continues to the end of the term, but by an assignment of the term he terminates the privity of estate. Between the lessor and the assignee of the term there is privity of estate, and by reason of such privity the assignee is liable for breaches of any express covenant of the lease which runs with the land or term and which occur while such privity continues to exist." (*Consolidated Coal Co.* v. *Peers,* 166 Ill. 361.) The consideration named was in part the mutual and dependent agreements of the parties. The agreement in the third clause no doubt had a material part in inducing the execution of the lease by the plaintiff in error, yet the clause was not made an agreement to run with the land but by its terms it purported to bind Atwood only, and related only to property owned by him or in which he was interested. The agreement was not for the benefit of the land

but was personal to the lessee. "The test whether a covenant runs with the land or is merely personal is whether the covenant concerns the thing granted and the occupation or enjoyment of it, or is a collateral and personal covenant not immediately concerning the thing granted. If a covenant concerns the land and the enjoyment of it, its benefit or obligation passes with the ownership, but to have that effect the covenant must respect the thing granted or demised, and the act to be done or permitted must concern the land or estate conveyed. An illustration of the rule is found in *Wiggins Ferry Co.* v. *Ohio and Mississippi Railway Co.* 94 Ill. 83." (*Purvis* v. *Shuman,* 273 Ill. 286.) In the *Wiggins Ferry Co. case* the ferry company conveyed rights and easements in two parcels of land to a railroad company, which covenanted to employ the ferry company to transport across the Mississippi river persons and property brought to the river upon the railroad or to be transported on the railroad. The Ohio and Mississippi Railway Company purchased the property, and the suit was for a breach of covenant. The court said that "in order that a covenant may run with the land, its performance or non-performance must affect the nature, quality or value of the property demised, independent of collateral circumstances, or must affect the mode of enjoyment," and the covenant having nothing to do with the two parcels of land in which the easement was granted, it was held that it was personal and did not run with the land. In *Chicago Title and Trust Co.* v. *Fine Arts Building,* 288 Ill. 142, it was held that a covenant in a lease providing that the lessor should have a first lien upon the lessee's property on the leased premises for the payment of the rent was not a covenant concerning the thing granted or the enjoyment of it but was collateral and personal and did not run with the land. Under the well settled rules of law, clause 3 of the lease was not a covenant running with the land and was not binding on the defendant in error.

The plaintiff in error argues that there was no evidence against it of negligence, and therefore the trial court erred in refusing to direct a verdict for the defendant. Section 15 of the act "relating to fires caused by locomotives" provides that in all actions for the recovery of damages on account of injury to property by fire communicated by a locomotive engine passing along a railroad, the fact that such fire was so communicated shall be taken as *prima facie* evidence to charge the railroad company operating the engine with negligence. The plaintiff in error contends that there was no evidence to show that the fire was started by its engine, and that if there were such evidence the *prima facie* case thus made was met and overcome by the evidence which it produced to show that the engines which passed along its road just before the fire were equipped with the best and most modern spark arresters.

The elevator was burned about four o'clock P. M. on May 20, 1920. The fire was first seen by Mr. and Mrs. Guetschow, who were driving along the highway. It was about half way up on the roof on the west side of the low part of the building, which was the engine house, and covered a space of not more than a foot square. There was no fire inside the engine house when the witness James Moore arrived. This was when the fire on the roof covered a space about four feet square. Moore afterward went into the engine house again and there was fire in some straw underneath the roof fire, and this the witness stamped out. There was a strong wind from the west and everything was dry. One train had passed on the railroad at about 3 :20 and another at 3 :52 P. M. The defendant introduced evidence that the engines which were pulling those trains were equipped with the best and most approved type of spark and fire-arrester, in good repair, and that a spark small enough to go through the wire mesh of the arrester would not remain alive for more than ten feet after it struck the outer air, regardless of the strength of the wind.

George Ryan, round-house foreman for the plaintiff in error, whose duty it was to inspect spark arresters, testified to an inspection of the engines drawing these trains and to the structure of the spark arresters with which they were equipped; that the spark arresters were of the best and most approved types, and in his opinion a spark passing through the arrester would be deadened almost instantly as it struck the air; that it would not continue more than ten feet as a burning object, regardless of wind conditions. Robert Young, boiler-maker for the plaintiff in error, testified that he inspected the engines within two or three days after the fire; that they were in good repair and in the same condition as they were on the 20th. Since this evidence tended to show that with the spark arresters in use and in good repair the engines would not emit sparks which could carry fire for a longer distance than ten feet, it is apparent that if the fire was set by a spark from one of the engines the spark arrester could not have been in good repair, for the elevator stood twenty-one feet east of the center of the main track, and any spark emitted would have been dead before reaching the elevator. There was no evidence that either engine was emitting sparks as it passed the elevator. The engineer of the second train testified that he shut off steam about 300 feet south of the station and elevator, as the station was a flag stop, and did not turn on steam again until he had passed about 300 feet north of the elevator; that while the steam was shut off the exhaust was not going through the smoke-stack and no cinders would be forced through the stack by the exhaust steam. The eaves of the elevator building were about on a level with him as he sat in his cab and he saw no fire on the roof as he went through. The evidence tending to show that the engine emitted a live spark which set the fire is this: There was no fire in the building; the wind was blowing from the engine toward the elevator, which was dry; a few minutes after the engine passed there was a

small fire, not larger than a foot square, on the roof; and there was no evidence which tended to show any other cause than a spark from the engine. The plaintiff in error contends that if the evidence in the case was sufficient to justify a conclusion that the fire was set by a spark from the engine, then the mere fact that a fire occurs along a railroad is *prima facie* evidence that it was set by a spark from a railroad engine, for along the busy railroads engines are always passing within short periods of each other.

In an early case, (*Chicago and Alton Railroad Co.* v. *Quaintance,* 58 Ill. 389,) in discussing the tendency of the evidence to show the origin of the fire, we said: "The proof shows that the house stood north of the track, distant about 150 feet. At the time the fire occurred everything was very dry and a strong wind prevailed from the south to the north, which would carry the sparks that escaped from the engine in the direction of the house of the appellee. The fire was not discovered until the lapse of about half an hour after the passage of the train which it is alleged occasioned the injury. It was first seen on the roof, on the south side, facing the track, and when first discovered it was a very small fire. The fire originated on the roof of the main part of the house, and some of the witnesses who went to assist the family testified there was no fire in any of the stoves in that part of the house. In fact there was no fire in any of the stoves about the house except the one in the kitchen, and that was in the L that projected north, and it is hardly possible, or probable, that sparks of fire from that chimney could have gone south over the main building against a strong wind prevailing from that direction and there set the roof on fire. The evidence of men of experience tends to show that fire-sparks could not be carried the distance the house was situated from the track and retain sufficient life to ignite anything upon which they might happen to fall. But no possible theory that can

be maintained by the evidence has been or can be suggested for the origin of the fire unless it was occasioned by fire-sparks emitted from the engine."

In this case are found the same facts tending to show the origin of the fire as in the case cited: The wind, the location of the fire, its size when discovered, the time since the passage of the engine, the facts that there was no fire in the building which could have caused it, and that the roof was about on a level with the smoke-stack. It was a question for the jury to determine whether this evidence justified the conclusion that the fire was set by a passing engine. It had a fair tendency to do so, and the court did not err in refusing to direct a verdict for plaintiff in error.

The evidence for the plaintiff in error tended to show that the equipment of the engines was of the best and most approved pattern, but it did not rebut the case, as a matter of law, made by the evidence for the defendant in error. The weight of the evidence for the defense was for the jury to determine. *Toledo, Peoria and Warsaw Railway Co.* v. *Pindar,* 53 Ill. 447; *St. Louis, Vandalia and Terre Haute Railroad Co.* v. *Funk,* 85 id. 460; *Cleveland, Cincinnati, Chicago and St. Louis Railway Co.* v. *Hornsby,* 202 id. 138.

The plaintiff in error argues that the court erred in giving instructions 1, 7 and 8 for the defendant in error. The question whether instruction 1 was erroneous or not was not presented to the Appellate Court and we cannot consider it here. (*Buck* v. *Rosenthal,* 273 Ill. 184.) It is argued that instructions 7 and 8 assume certain facts to be proved. The language used does not sustain the objection to either instruction.

The judgment will be affirmed.        *Judgment affirmed.*